**Charles H. SIMMS, Plaintiff,**

v.

**U.S. GOVERNMENT PRINTING OFFICE, et al., Defendants.**

**No. Civ.A. 98–2399(JR).**

United States District Court, District of Columbia.

Feb. 3, 2000.

---

Sol Zalel Rosen, Washington, DC, for plaintiff.

Claire Whitaker, Assistant U.S. Attorney, Washington, DC, for defendants.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiff sues under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging racially discriminatory denial of job training and retaliation for filing an EEOC complaint. Defendant moves to dismiss or for summary judgment. The motion for summary judgment must be granted because plaintiff asserted his discrimination claim too late, and because plaintiff has not made out a prima facie case of retaliation.[1]

### Background

Between 1991 and July 1992, Charles Simms, a long-time Government Printing Office ("GPO") employee, was detailed as a journeyman keyboard operator in the Federal Aviation Administration ("FAA") section of the Electronic Photocomposition Division ("EPD"). Def.'s Facts ¶ 1. The FAA section was organized in 1989 to convert the software used for the production of FAA documents from the old ATEX system to a newer kind of software called Interleaf. Pl.'s Facts ¶ 1.

When Mr. Simms and another African–American male—both "keyboard operators"—were brought into the section, most of the conversion work had been completed. Def.'s Facts ¶ 5. As his supervisors understood it, Mr. Simms' duties were to "key and prep data" and to perform trial production runs of the new software in an effort to identify problems that others could later remedy before a similar system was put into place in an FAA satellite office in Atlantic City, New Jersey. *See id.* ¶ 7. Mr. Simms had a different expectation. He apparently envisioned learning the same computer skills as two white employees (Elizabeth List and George Gregory) who had the title of "proofreader" and who had been working on the project since its inception. Pl.'s Facts ¶ 1.

Mr. Simms's claim of discrimination asserts that, during his tenure at the FAA section, he was denied training opportunities based on his race and given "virtually no responsibility" while similarly situated white employees were given more training and better work. *See* Am.Compl. ¶¶ 13, 19. He provides two—but only two—concrete allegations of fact to support his claim. First, he complains that he was not invited to attend training in October 1991 in Atlantic City on the new Interleaf software system, while Ms. List, Mr. Gregory, and Mr. Simms's supervisor, Carl A. Zoeller (white), did attend. *See id.* ¶¶ 23–24. Second, he complains that, in late 1991, Mr. Zoeller made "a joking gesture" in front of Ms. List and Mr. Gregory and "looked over at [him] and the other black employee[ ], and said: 'Look at them. They look like two crows sitting on a fence.'" Am.Compl. ¶ 33.

Mr. Simms first contacted GPO's EEO office about these allegations of discrimination on February 21, 1992. *See* Def.'s Facts ¶ 11. On April 1, 1992, he filed a formal complaint of race discrimination. *See id.* ¶ 12. The complaint was investigated, and Mr. Simms received a copy of the investigative report ("IR"). *See id.* ¶ 13. A hearing was held before an administrative judge, who issued a recommended decision finding no evidence of racial discrimination. *See id.; see also* Ex. A to Def.'s Mot.

Mr. Simms's retaliation claim complains of two statements made by a new supervisor, Martin Mehlberg, during the four-

---

1. Having considered materials outside of the pleadings, I have treated the motion as one for summary judgment. *See Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C.Cir.1993).

year period 1992–1996. Mr. Mehlberg grew angry when he learned at some point in 1992 that he had been named in Mr. Simms's discrimination complaint, and told Mr. Simms: "From this day forth, I don't want you to say hello to me, don't talk to me in the hall. I don't want to know you. Just stay away from me. I will go my way, you go yours. Leave me alone." Def.'s Mot. at 9 (quoting Administrative Hearing Testimony ("HT") at 410).

Three years later, in 1995, Mr. Mehlberg stated that he did not like plaintiff and would not train him. *See id.* An administrative judge heard this complaint, and issued a recommended decision on May 7, 1998, in favor of the defendants.

*Analysis*

*Discrimination at the FAA Section*

GPO's motion seeks dismissal of Mr. Simms's discrimination claims because he failed to contact an EEO counselor within 30 days of the alleged discriminatory events. Def.'s Mot. at 14–16.

In 1991 and 1992, when the alleged discrimination occurred, a plaintiff was required to bring discriminatory events to the attention of an EEOC counselor "within 30 calendar days of the date of the alleged discriminatory event or personnel action, or the date that the aggrieved person knew or reasonably should have known of the discriminatory event of personnel action." 29 C.F.R. § 1613.214(a)(1)(i) (1992).

■ The training trip to Atlantic City took place in October, 1991. *See* IR, Tab 6, pp. 10–12. Mr. Zoeller made the allegedly racist remark in November or December of 1991.[2] *See* Def.'s Facts ¶ 11; IR, Tab 6, p. 10. Mr. Simms first sought EEO counseling on February 21, 1992, *see* Def.'s

Facts ¶ 11; IR, Tab 3, more than 30 days after both incidents.

■ Mr. Simms appears to concede this chronology, *see* Pl.'s Facts ¶ 9. His central argument in opposition to the motion is that his claims are saved by the continuing violations doctrine. In order successfully to invoke that doctrine, a plaintiff must show "a series of related acts, one or more of which falls within the limitations period." *Valentino v. United States Postal Serv.*, 674 F.2d 56, 65 (D.C.Cir.1982). Mr. Simms has not done so. Instead, he has attached to his opposition a self-serving, unsupported, unsigned statement that contains a flurry of claims of *recent* "violations." *See* Ex. G, Pl.'s Opp'n. These new allegations do not establish or support a claim that a "related act" fell within the limitations period or that GPO has "maintain[ed] ... a discriminatory system both before and after the [statutory] period," *Valentino*, 674 F.2d at 65.

In any event, Mr. Simms did not explicitly plead a continuing violation in either his original complaint or his amended complaint. This fact alone bars assertion of this equitable defense at this time. *See Childers v. Slater*, 44 F.Supp.2d 8, 17 n. 8 (D.D.C.1999).

*Retaliation*

■ In claims of reprisal or retaliation under Title VII, the plaintiff must demonstrate as part of his *prima facie* case that the employer-defendant took an "adverse employment action." *Brown v. Brody*, 199 F.3d 446, 455 (D.C.Cir. 1999). To establish an adverse employment action, a Title VII plaintiff must at a minimum allege some "objective tangible harm." *Id.* at 457. "Mere idiosyncrasies of preference are not sufficient to state an injury." *Id.*; *see also Childers*, 44 F.Supp.2d at 18 (adverse employment action must involve "a

---

**2.** There is some ambiguity in the record as to precisely when Mr. Zoeller made the allegedly racist statement. Even if the statement was made within the 30 day period, however, "stray remarks," even those made by a supervisor, are insufficient to create a triable issue

of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff. *See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir.1987).

tangible change in the duties or working conditions constituting a material employment disadvantage").[3] For verbal "comments to rise to the level of adverse action, the conduct must be so egregious as to alter the conditions of employment." *Henry v. Guest Servs.,* 902 F.Supp. 245, 252 n. 9 (D.D.C.1995).

 The two comments made by Mr. Mehlberg in 1992 and 1996 are insufficient to establish a *prima facie* case of retaliation, and indeed Mr. Simms has failed to present affirmative evidence that he suffered *any* negative employment consequences based on his exercise of a statutorily-protected right. *See Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). To the contrary, he was assigned to a more desirable position in the Text Processing Unit after leaving the FAA section,[4] and he has received no fewer than five salary increases and one promotion since May 16, 1993. *See* Def.'s Supp. Filing in Support of Def.'s Mot. to Dismiss or for Summary Judgment and Errata.

 Mr. Simms appears to assert (for the first time in his opposition papers) that he was subjected to a hostile work environment. The claim is made too late, but it also fails to state a claim upon which relief can be granted. A hostile work environment claim must assert that an employee's "workplace" is permeated with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (citation omitted); *Barbour v. Browner,* 181 F.3d 1342, 1348 (D.C.Cir.1999) (no jury could find hostile work environment based on two

isolated incidents where plaintiff was mistreated even though "[t]hese episodes certainly reflect poorly upon the professionalism of [defendant's] employees"). Mr. Simms makes no such allegation.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons set forth in the accompanying memorandum, it is this 2nd day of February 2000,

**ORDERED** that defendant's motion for summary judgment [# 11] is **granted.**

---

**3.** Although different employer actions, including harassment, can be viewed as retaliatory behavior, *see Batson,* 912 F.Supp. at 573, the actions must engender some negative employment consequences. *See Brown v. Bentsen,* 921 F.Supp. 1, 2 (D.D.C.1995); *Rowland v. Riley,* 5 F.Supp.2d 1, 3 (D.D.C.1998).

**4.** Mr. Mehlberg made the first statement *before* Mr. Simms successfully applied to work in his section. Mr. Simms was promoted to the position of Head Deskperson in 1997, *after* Mr. Mehlberg made the second remark.