Karl PARKER, Jr., Plaintiff,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY, et al., Defendants.  (3 Cases)

Civ. A. Nos. 79–0158, 80–2626 and 81–0266.

United States District Court, District of Columbia.

Jan. 28, 1983.

Robert L. Cohn, Cohn & Rabin, Washington, D.C., for plaintiff.

Morgan D. Hodgson, Neil A. Kaplan, Peter L. Wellington, Steptoe & Johnson, Washington, D.C., for defendants.

Edward D. Friedman, Friedman & Wirtz, Washington, D.C., for United Transp. Union.

## OPINION

HAROLD H. GREENE, District Judge.

In these consolidated cases a railroad conductor sues his employer and his union,[1] alleging that an illegal affirmative action plan has kept him off the promotion track to the sought-after job of engineer. Plaintiff, a white male, claims that the employer was wrong to formulate the affirmative action program that it did, to administer it to plaintiff's detriment, and to retaliate against him when he complained.[2] Plaintiff charges the union with wrongfully acquiescing in the plan and with failing to respond adequately to his complaints about it. Before the Court are the union's motion for summary judgment and a motion for partial summary judgment on timeliness grounds filed by the railroad and joined in by the union. Having considered the parties' written submissions and heard oral argument, the Court will grant the union's motion and deny that of the railroad.

### I

■ Although plaintiff's complaints, without the context provided by the summary judgment papers, state claims upon which relief may be granted,[3] the legal theories under which plaintiff is proceeding against the union are not as fully developed as they might be. In Nos. 79–0158 and 80–2626 plaintiff charges the union with discrimination under 42 U.S.C. § 1981 (1976) for having "approved" the railroad's

---

1. The United Transportation Union (UTU).

2. Plaintiff was hired as a trainman in 1974 and promoted to conductor in 1977. He has made several unsuccessful applications for transfer to the position of locomotive fireman, a training assignment which, if properly completed, could have led to his becoming an engineer. See *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012 (D.C.Cir.1981).

3. Memorandum Order of May 3, 1982.

allegedly unlawful affirmative action plan.[4] In No. 81–0266 plaintiff's amended complaint contains a more specific allegation of wrongdoing by the union, to the effect that

Defendant UTU has acquiesced in, assisted and affirmed all actions of Defendant B & O in that plaintiff made demands upon Defendant UTU, that it file and process grievances in plaintiff's behalf and secure plaintiff's transfer, together with all back pay and seniority which plaintiff was entitled. However, the Defendant UTU failed and refused to process any grievance in plaintiff's behalf, and, instead Defendant UTU notified plaintiff that it had determined the actions of Defendant B & O were proper and that it would not file the grievance in his behalf. This decision not to process plaintiff's grievances was not made in good faith or in the exercise of discretion.

The attack on the union's handling of grievances suggests that plaintiff is claiming that the union breached its duty of fair representation.[5] The facts do not support either claim, however, even viewed in a light most favorable to plaintiff. Only if the duty of fair representation were far broader than it is could plaintiff make out a colorable claim that the duty had been breached in this case, and only then could he begin to make out a § 1981 claim. In

his pleadings and at oral argument plaintiff's counsel postulated a practically boundless duty on the union's part, a duty to "actively negotiate nondiscriminatory treatment of its members."[6] This phrasing it lifted from a case concerning discrimination against blacks by a predominantly white employer and white union, *Macklin v. Spector Freight Systems, Inc.,* 478 F.2d 979, 989 (D.C.Cir.1973), in which the Court wrote that one means of reducing discrimination against blacks by an employer would be "for the union, in its vital role as bargaining agent, to negotiate actively for nondiscriminatory treatment in aid of its *black* members" (emphasis added).

It is doubtful that principles developed in cases of egregious discrimination against blacks correctly define a union's duty when the allegation is that the majority intentionally discriminated against or acted unfairly toward a member of its own racial or sexual group through affirmative action.[7] Even if the principles were properly transferable, however, plaintiff does not allege facts that, if true, would demonstrate a failure by the union to "actively negotiate" in his interests because he was white and male. Plaintiff states that the union discriminated against white males by approving the affirmative action plan—yet the union was not a party to the plan.[8]

**4.** Plaintiff has withdrawn a similar charge against the union in No. 80–2626 brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1976) and the Court previously dismissed the Title VII claim against UTU in No. 79–0158. Memorandum Order of May 3, 1982.

**5.** The duty derives from the union's role as exclusive bargaining agent. See, *e.g., Humphrey v. Moore,* 375 U.S. 335, 342, 84 S.Ct. 363, 367–68, 11 L.Ed.2d 370 (1964). The duty of fair representation—a judicially crafted doctrine based on provisions in the nation's labor laws—was first developed to help blacks get fairer treatment from their unions and employers. *Steele v. Louisville & N.R.R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); T. Kheel, Labor Law § 28.02.

**6.** · Plaintiff's memorandum of points and authorities in opposition to defendant B & O's motion for partial summary judgment and defendant UTU's motion for summary judgment, at 57.

**7.** Language in *Macklin,* the decision plaintiff cites to the Court, indicates that its holding is limited to situations "where there is such solid evidence of employer discrimination [against blacks] as is alleged here." Plaintiff does not argue, nor could he realistically begin to do so, that B & O Railroad has a long and sordid history of discriminating against white males. Rather, plaintiff's claim is that the railroad's newly-adopted affirmative action plan unduly trammels on the rights of white males. Both in intent and effect the two situations are quite distinct.

**8.** As a federal contractor B & O is obligated to engage in some form of affirmative action. See Executive Order 11246. UTU recognizes this obligation in agreements relating to hiring by making the contract provisions "subject to the Carrier's legal obligations." This caveat is the extent of the union's "involvement" with B & O's affirmative action plan according to an affidavit filed by H. Durwald Masters, General Chairman of the UTU. Nothing plaintiff has

If plaintiff is arguing that the union acted discriminatorily by not making defeat or modification of the plan one of its collective bargaining objectives, the argument is without merit. Certainly the union was under no duty to try to obstruct the interests of minorities, the persons aided by the railroad's affirmative action plan, and the individuals the civil rights laws are intended most zealously to benefit and protect. *United Steelworkers of America v. Weber,* 443 U.S. 193, 202–03, 99 S.Ct. 2721, 2726–27, 61 L.Ed.2d 480 (1979). A stance hostile to the interests of women and minorities might well have subjected the union to legal liability for discrimination of a more traditional sort than that alleged by plaintiff, and the union, within its discretion, was entitled to forego that course of conduct.[9]

The fact is that plaintiff is not really challenging the union's conduct during negotiations; he is complaining, at best, about the union's enforcement of existing collective agreements through the grievance process. Yet it is difficult to see what bearing the union's duty to "actively negotiate" a certain outcome, were such a duty to exist, would have on plaintiff's case when the union's allegedly wrongful conduct occurred in the enforcement stage. As to this claim, plaintiff seems to be arguing that the union had a duty to police the employer's affirmative action program not only by processing his grievance to the last possible stage but also by actually effecting his transfer to a fireman position. This contention is meritless. The Supreme Court expressly rejected such a broad characterization of the duty of fair representation in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) in a passage quoted in plaintiff's own pleadings.

> [W]e do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement.

386 U.S. at 191, 87 S.Ct. at 917

In *Vaca* the Court explained that

> [a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.

386 U.S. at 190, 87 S.Ct. at 916.[10]

Properly applied to this case, then, the duty of fair representation entitled plaintiff to no more than a nonarbitrary, nondiscriminatory, and good faith response to his complaints that the B & O violated a section of the collective bargaining agreement in fail-

alleged contradicts this. In contrast, five unions did sign certain "Seniority Modification Agreements" in 1975 and 1976 giving blacks and females some preference. UTU was not one of these unions. Compare *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (voluntary affirmative action plan collectively bargained by employer and union).

**9.** There was nothing on the face of the affirmative action plan to indicate to the union that the plan was unduly hostile to men or "unnecessarily trammel[ed] the interests of the white employees." *United Steelworkers of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). Nor did the racial and sexual mix of persons hired and promoted by the railroad change dramatically, see *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012 (D.C. Cir.1981), so as to suggest to the union that the plan was anything more than a reasonable effort by the railroad, compelled by an Executive Order, to compensate for underutilization of women and minorities. Thus this case does not present the question whether a union would have a duty to intercede if an employer's affirmative action plan, or its employment practices generally, were flagrantly unfair to white males.

**10.** A recent Supreme Court decision suggests that even if plaintiff were to prevail in his case against the union the most he could hope for in damages would be the difference between the cost of obtaining redress through internal union procedures and the cost of obtaining redress in a court. *Bowen v. United States Postal Service,* —— U.S. ——, ——, 103 S.Ct. 588, 599, 74 L.Ed.2d 402 (1983). This is because the union's actions did not "deprive [Parker] of immediate access to a remedy [and therefore] did not increase the damages that the employer otherwise would have . . . to pay." See also *Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

ing to transfer him to "fireman." [11] This he secured. The section of the labor agreement that plaintiff claims to have been violated by the B & O provides that persons with seniority as conductor, such as plaintiff, "will be considered for transfer to positions of locomotive fireman (helpers) in preference to hiring individuals who have not established seniority with the carrier in any class or craft." [12] The clause promised consideration on the basis of seniority, not a certain transfer.

It is undisputed that a union officer, upon learning of plaintiff's complaints of discrimination, called a foreman whose responsibilities included the designation of firemen to inquire whether plaintiff had been considered for transfer. [13] He was informed that plaintiff had been considered and had been given several tests to determine his eligibility. The then incumbent union official [14] was further told that plaintiff had not been selected because he scored low on one of the tests, the Davis Reading Test. The union declined formally to grieve the matter because, reasonably so, there appeared to have been no contract violation. [15] Plaintiff's claims that this decision was made in discriminatorily, bad faith, or was based on hostility toward him are simply devoid of merit. [16] Consequently, the Court will grant the union's motion for summary judgment and dismiss the complaints against it. [17]

## II

The partial summary judgment sought by B & O would eliminate from these lawsuits the claims of discrimination arising from the two instances before 1978 when a total of fifteen of plaintiff's co-workers were transferred to locomotive fireman positions and plaintiff was not. Plaintiff contends that but for the railroad's newly-adopted, allegedly unlawful affirmative action plan, coupled with retaliation by his superiors on account of his protests over the plan, he would have been among the fifteen.

Insofar as these claims are advanced under a Title VII theory, the railroad argues that they must be dismissed pursuant to 42 U.S.C. § 2000e–5(e) because the pre-1978 transfers occurred more than 300 days before plaintiff filed a charge of unlawful

11. It is doubtful that plaintiff's complaints rose to the level of a formal grievance. He apparently made oral complaints and wrote several letters but he did not follow the proper procedures as announced in the union's constitution. Plaintiff argues that since the union followed up on his complaints it must have regarded them as constituting a grievance. The conclusion does not follow, however, for a union need not wait for a grievance to be filed to express interest in a member's circumstances, nor would this be desirable as a matter of labor policy. For purposes of this motion it may be assumed that the complaints did constitute a grievance without changing the result.

12. Mediation Agreement, Case A–10222, August 25, 1978, Section VIII.

13. Ray Myers, president of UTU Local 610–T, called Thomas Kirk, General Road Foreman of Engines. This was the manner in which similar complaints about transfer decisions were handled by the union. See affidavit of H. Durwald Masters.

14. Ironically, plaintiff was recently himself elected to the post of local chairman.

15. The union was under no duty to inform plaintiff of these steps. See *Guzman v. Safeway Stores, Inc.,* 530 F.Supp. 29, 34 (W.D.Tex. 1981) and cases cited therein.

16. The union has processed other grievances in plaintiff's behalf and has brought several to the final stage of arbitration.

17. The Court expresses no opinion on the merits of plaintiff's claims against the railroad to the effect that its plan actually does "unnecessarily trammel" the interests of white males or, even if the plan was lawful under Title VII, that the railroad retaliated against Parker in violation of the "opposition clause" of Title VII, 42 U.S.C. § 2000e–3(a) (1976). See *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1020 (D.C.Cir.1981).

employment practices with the Equal Employment Opportunity Commission. In response, plaintiff cites the judicially crafted exception to Title VII's various time bars allowing courts to hear alleged Title VII violations that are themselves outside of the limitations period but which continued in an uninterrupted fashion to a time within the limitations period. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *McKenzie v. Sawyer,* 684 F.2d 62, 73–74 (D.C.Cir.1982). The railroad disputes the applicability of the exception by attempting to liken this action to several cases in this Circuit in which courts refused to apply the doctrine.

The prior decisions are not on all fours with this case. For instance, in *Valentino v. United States Postal Service,* 674 F.2d 56 (D.C.Cir.1982), the employer had significantly changed its hiring procedures, moving from no affirmative action program to one that placed women and minorities on newly-created vacancy review committees, and it had done so several months before plaintiff filed her EEO charge. The plaintiff there invoked the continuing violation exception to persuade the district court to hear claims regarding acts the defendants had taken well before the institution of the new system. As the link between the two time periods, she offered only the allegation that during the pre-limitations, pre-affirmative action period there had been "complaints of '[f]emale employees ... that they were the subject of discriminatory practices, particularly the lack of proper advancement.'" 674 F.2d at 62 n. 3. She made no claim that she herself had been adversely affected by a practice in effect at that time that continued into the limitations period. The absence of a continuing, adverse impact on plaintiff occasioned by a constant, discriminatory employment policy explains the result on the timeliness issue in *Valentino* just as it distinguishes another decision cited by the railroad, *Aikens v.*

*United States Postal Service,* 642 F.2d 514, 516–17 n. 1 (D.C.Cir.1980), from this case.

B & O first instituted its policy of taking race and sex into account in the filling of fireman positions in 1975. Plaintiff alleges that application of that policy disadvantaged him in concrete ways in 1976 and continued to disadvantage him in 1977 and up to and beyond the time he filed his EEO charge. The railroad may have tinkered with the specifics of the affirmative action plan in the interim, by making certain tests mandatory in 1977 and involving one or two different individuals in the transfer decisions, but these steps did not interrupt the railroad's continuing policy of affirmative action which is the gravamen of plaintiff's complaints. It may be that the railroad modified its affirmative action plan precisely because it determined, after several months worth of experience with it, that the plan affected white males too harshly. It may be that both approaches were entirely lawful under *United Steelworkers of America v. Weber, supra.* These are questions that can be answered only after a trial. Plaintiff has alleged continuing violations sufficient to entitle him to trial on all of his Title VII claims.

■ Turning to the § 1981 claims, defendant asserts that they are barred due to the one-year statute of limitations that is now clearly applicable to actions brought under the District of Columbia Human Rights Law, D.C.Code Ann. § 1–2544(a), see *Davis v. PEPCO,* 449 A.2d 278 (D.C. App.1982) and *Brown v. Capitol Hill Club,* 425 A.2d 1309, 1311 (D.C.App.1981), and that is therefore applicable to § 1981 actions brought in a federal court sitting in the District of Columbia. See *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). When plaintiff filed his first complaint in 1979, however, federal courts in the District of Columbia labored under the supposition that the District of Columbia

would apply its residual three-year statute of limitations to actions brought under the D.C. Human Rights Law, and consequently they applied a three-year statute of limitations to § 1981 actions. See *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 994 (D.C.Cir.1973); *McCloud v. National Railroad Passenger Corp.*, 25 Fair Empl. Prac.Cas. (BNA) 513, 514 (D.D.C.1981).

Plaintiff maintains that it would be unfair retroactively to apply the local courts' recent elucidation to his disadvantage. He invokes the doctrine of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), to the effect that a decision regarding a statute of limitations may be applied nonretroactively if it "establish[es] a new principle of law, either by overruling past precedent on which litigants may have relied ... or by deciding a case of first impression whose resolution was not clearly foreshadowed." 404 U.S. at 106, 92 S.Ct. at 355. The Court agrees with plaintiff that the confusion surrounding the applicable statute of limitations in 1979, when plaintiff filed his first complaint, justifies prospective application of the one-year statute of limitations as announced in 1981 in the *Brown* dicta and in 1982 in the *Davis* decision. Plaintiff may proceed to trial on all of his § 1981 claims against the railroad.