**Karl PARKER, Jr., Plaintiff,**

v.

**The BALTIMORE AND OHIO RAILROAD COMPANY, et al., Defendants.**

Civ. A. Nos. 79–0158, 80–2626 and 81–0266.

United States District Court, District of Columbia.

Aug. 8, 1986.

Robert L. Cohn, Bethesda, Md., for plaintiff.

H. Russell Smouse, Ransom J. Davis, Jack L.B. Gohn, Melnicove, Kaufman, Weiner & Smouse, Baltimore, Md., for defendant B & O; Nicholas Yovanovic, Baltimore, Md., of counsel.

Edward D. Friedman, Friedman & Wirtz, Washington, D.C., for defendant UTU.

## OPINION

HAROLD H. GREENE, District Judge.

The plaintiff in this case, a white male, brought these "reverse" discrimination and retaliation actions against his employer, defendant B & O Railroad.[1] The essence of plaintiff's claim is that B & O discriminated against him on the basis of his race and sex through its affirmative action program when it failed to transfer him to a position as a locomotive fireman. Plaintiff also claims that, because he had complained of discrimination, B & O retaliated against him through various acts of harassment. After a long and tortured history,[2] the action went to trial before the Court on October 7, 1985. The Court has now reviewed a voluminous record, including two weeks of trial testimony, extensive exhibits, and proposed findings of facts and conclusions of law, and it concludes that plaintiff has failed to establish discrimination or retaliation on the basis of race or sex. Accordingly, judgment will be entered in favor of defendants.

## I

The evidence adduced at trial established the following facts.[3] In response to a historic underutilization of minorities and females in particular craft areas in its workforce, including the locomotive fireman craft, B & O adopted and implemented an affirmative action program,[4] involving both hiring and transfers,[5] with the goal of increasing the numbers of blacks and females employed in these white male dominated crafts.[6]

---

1. Plaintiff filed three separate actions which were consolidated by this Court. The United Transportation Union (UTU), a labor organization representing plaintiff in his capacity as a brakeman/conductor for the B & O, was also named as a defendant in all three actions. The Court granted summary judgment in favor of UTU in January 1983, *Parker v. B & O,* 555 F.Supp. 1182 (D.D.C.1983), and UTU's remaining involvement in the case as a Fed.R.Civ.P. 19 party is limited to issues of remedy only. As a practical matter, then, B & O is the sole defendant on the issue of liability.

2. This Court originally granted summary judgment in favor of defendant in 1981. That decision was reversed by the Court of Appeals for this Circuit, *Parker v. B & O,* 652 F.2d 1012 (D.C.Cir.1981), and, at the direction of the Court of Appeals, plaintiff was given leave to amend his complaint. The parties then signed a consent decree which would have disposed of the case, and the Court approved that proposal in February of 1983. However, Rule 19 defendant UTU opposed the decree and appealed the order. The Court of Appeals vacated the approval and remanded the case for further consideration in light of the Supreme Court's ruling in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). This Court then ruled that *Stotts* invalidated the consent decree, and the case proceeded to trial.

3. As noted, the facts and circumstances involved in this case are complicated and voluminous. The Court will set out herein only the facts necessary for the legal discussion *infra.*

4. The decision to implement an affirmative action program was prompted by Executive Order 11246, issued on September 24, 1965. That order directs all government contractors to take affirmative measures to insure that its employment practices are non-discriminatory. *See generally,* Schlei & Grossman, Employment Discrimination Law, at 740 *et seq.* (1976 and 1979 Supp.).

5. Other aspects of B & O's affirmative action program involve recruitment from minority and female referral sources and pursuit of equal employment opportunity clauses in collective bargaining with the union.

6. There are few areas of the workforce where affirmative action is more justified than in the railroad industry, with its long history of company and union antipathy toward blacks and women.

From 1974 to 1976, B & O set hiring goals for blacks on a percentage basis as part of its affirmative action program. These hiring goals were based on a work-force analyses, availability analyses, and past hiring experience. In 1975 and 1976, the system-wide hiring goal for blacks was 25%. In 1977, after the goals were revised and re-established on a reporting unit basis, the goal in plaintiff's reporting unit was 20%. While fixed percentage hiring goals for women were not established until 1981,[7] B & O attempted to lessen underutilization of women in its workforce as well. Since 1977, B & O has compiled reports pertaining to its hiring of minorities and females on a quarterly and yearly basis, complete with an EEO officer's analysis of each reporting unit's performance in attempting to meet the goals.

In addition to setting these hiring goals, B & O entered into Seniority Modification Agreements (SMAs) with various unions which provided some opportunities for members of minorities and females already employed by B & O to transfer to white male dominated crafts. The SMAs, which went into effect in 1976, permitted certain minority and female employees with company seniority dates prior to August 1971 to file applications to transfer to another craft within 180 days of the effective date of the SMA. When a position opened up[8] in a craft listed on the SMA transfer candidate's application form, the candidate had fifteen calendar days to apply for the opening. If the SMA candidate met the minimum qualifications for the position, he or she would be transferred ahead of non-SMA applicants in the order of his or her seniority.

B & O's affirmative action program has in fact resulted in an increase in the number of minorities and women employed in the white dominated craft of locomotive engineers, although it has fallen far short of its goals. In the period beginning December 1976 and ending in January 1982, 81 persons have been selected for locomotive fireman positions in the Baltimore West End district to which plaintiff applied for transfer. Of these 81 persons, eight have been minority males, one has been a minority female, and five have been white females. Put another way, 82% of the firemen selected have been white and 91% have been male.

Plaintiff's claims of reverse discrimination and retaliation arise from his unsuccessful attempts to be transferred from his position as a trainman to a position as a locomotive fireman.[9]

Although B & O had no written guidelines on procedures for transfer during the relevant period, testimony at trial established that application for transfer to a locomotive fireman position at all times relevant to this case was a four step process. First, the employee had to be referred to the employment office for testing and interview. In order to be so referred, the employee had to express interest in transfer to the General Road Foreman of Engines or the Superintendent of Operations *and* have a favorable recommendation from a supervisor. Second, the employee had to achieve a passing score on the required tests.[10] Third, if the candidate achieved satisfactory scores on all the tests, he or she would be interviewed. Finally, those candidates who interviewed satisfactorily would be referred for a medical examination. Candidates passing the medical examination would then be transferred into fireman service.

7. The hiring goal for women in 1981–82 was 17%.

8. SMAs and hiring goals applied only to the filling of vacancies. They never required the discharge of white males.

9. The position of locomotive fireman is a training position for engineer. Several B & O employees testified at trial that the transfer was considered a promotion to a more prestigious job.

10. Prior to June 10, 1977, the only test required was the Employment Qualification "C" test (EQC). After June 10, 1977, the B & O also required the Davis Reading and SRA Mechanical tests.

## II

Plaintiff Karl Parker began working for B & O Railroad on October 14, 1974, and he worked as a brakeman and as a conductor in the Baltimore West End Division of the B & O for the period of time relevant to this lawsuit. On August 18, 1975, plaintiff submitted a written expression of interest in a transfer to locomotive fireman. The following year, a job order issued to hire six locomotive firemen in the Baltimore West End.[11] In December 1976 and January 1977, two white males, one white female, one black female, and two black males were selected for these six positions. The two black males were selected pursuant to the SMAs,[12] and the two women were selected pursuant to other parts of B & O's affirmative action program.[13] Although both SMA candidates received favorable recommendations from supervisors, neither was required to take the applicable tests because the SMA provided that SMA candidates did not have to take non-skills tests. The two women took and passed the requisite EQC test.[14]

Plaintiff was not referred for testing at this point because Acting General Road Foreman Kessecker had not obtained a favorable recommendation from plaintiff's supervisor. As a consequence, plaintiff was not considered further for transfer to one of the six slots.

After his non-selection, plaintiff met with General Road Foreman Kirk to complain that he had been treated unfairly in the selection process. Kirk, who assumed the job of Road Foreman in February 1977, had no responsibility for or knowledge of the January 1977 selections, and he told plaintiff that he would be considered for referral for testing on the next job opening for locomotive fireman (which was expected to occur in the spring of 1977).

In June and July 1977, a new job order was issued, requesting ten locomotive firemen for the Baltimore West End district. Although Kirk had initially placed plaintiff's name on the list of candidates to be referred for testing, he actually referred for testing only half of the candidates because of the disproportionately large number of candidates eligible for a small number of positions. Plaintiff was not among those so referred because Kirk had not received a positive recommendation from plaintiff's supervisor. Of the 26 candidates who were referred for testing, 15 were white males and 11 were minority males, all with positive recommendations. The nine white males who were ultimately selected for the position all satisfactorily completed the required steps for the transfer discussed *supra*.[15]

When plaintiff discovered that he had not been referred for testing, he called Kirk at home and asked why he had not been transferred.[16] A heated conversation followed, during which Kirk stated that "Any man who is really sincere and wants advancement does not walk out and threaten—or even go through with suing the company he works for."[17] Kirk also told plaintiff that "When your turn comes up, you'll be interviewed. And if you have the

---

11. The October job order represented the first opening for locomotive firemen subsequent to plaintiff's expression of interest.

12. The two black male candidates were the only two SMA candidates interested in transfer.

13. B & O stipulated that it did take sex and race into consideration pursuant to its affirmative action program in filling the six slots.

14. Although plaintiff claims that the two women selected in 1976–77 did not pass the EQC test, the defendants have provided unambiguous doc-

umentary evidence and oral testimony that both women did in fact pass the EQC test. *See* Defendants' Exhibit 105.

15. The tenth slot was apparently not filled at that time.

16. The conversation between plaintiff and Kirk was recorded by plaintiff on a home wiretap device, and the recording was entered into evidence and played at trial. *See Parker v. B & O Railroad,* 555 F.Supp. 1177, 1182 (D.D.C.1983).

17. Plaintiff's Exhibits F and H.

necessary qualifications, you'll be selected."[18]

In November 1977 Kirk again placed plaintiff on a list of individuals to be referred for testing, despite the fact that plaintiff had still not received a positive recommendation from a supervisor. In April 1978, plaintiff took the required Davis Reading and SRA Mechanical tests, but he failed the former by one point and as a consequence was not considered further. Ultimately, two white males were selected for the positions, both of whom had passed the Davis Reading test as well as satisfying the other requirements for transfer.

While a number of other job orders were filled between April 1978 and December 1981, plaintiff was not considered for any of them because he had failed the Davis Reading test and had never requested retesting.[19] All of the candidates selected for the position after April 1978 satisfied all of the requirements for transfer.[20]

In January 1979, after exhausting administrative remedies, plaintiff filed a complaint in this Court alleging discrimination. Although 12 more firemen were hired in the months following the filing of the complaint, plaintiff again was not referred because he had not passed the Davis Reading test and had never received a positive recommendation. The 12 persons selected, eight white males, two black males, and two white females, all satisfied the requirements for transfer discussed *supra.*

Beginning in July 1979, after plaintiff filed his initial lawsuit, he had a series of confrontations with Kirk and other railroad officials, some of which resulted in disciplinary action.[21] Thus, plaintiff was charged, among other things, with violation of company rules for failing to notify the proper authority for delay of train, countermanding an instruction to move a train given by Kirk, and failing to exercise proper care while boarding a caboose. Plaintiff thereafter filed his second and third lawsuits, claiming retaliation based on these and other incidents.

### III

The first issue presented by this action is whether plaintiff was discriminated against because of his status as a white male in the December 1976–January 1977 referrals and selections for locomotive firemen. To establish a *prima facie* case of reverse discrimination,[22] plaintiff must prove: (1) that background circumstances support the suspicion that B & O is the unusual employer who discriminates against white males; (2) that he applied for and was qualified for a job for which B & O was seeking applicants; (3) that despite his qualifications, he was rejected; and (4) other employees of similar qualifications who were not white males were indeed promoted at the time his request for transfer was denied. *Parker v. B & O,* 652 F.2d 1012, 1017–18 (D.C.Cir. 1981); *see also, Bishopp v. District of Columbia,* 788 F.2d 781 (D.C.Cir.1986); *Dougherty v. Barry,* 607 F.Supp. 1271,

---

**18.** Kirk stated at another point in the conversation, "... When your turn comes up, the employment officer for this company will notify you and you will then undergo a series of tests. And if you qualify, then you have every chance in the world of being selected."

**19.** Although plaintiff was never informed that he had failed the test, he never contacted the Employment Office to inquire about the test results as the candidates were instructed to do at the conclusion of the testing.

**20.** Plaintiff alleges that B & O waived various of the requirements for several candidates, and thus transferred some individuals who did not satisfy the stated requirements. This contention, which the Court rejects, will be discussed *infra.*

**21.** Prior to that point plaintiff had an unblemished work record.

**22.** It is unclear whether plaintiff is still pressing a claim of discrimination relating to the June 1977 selections, or whether he claims that the failure to select him at that point was retaliation alone. It is clear, however, that plaintiff could not sustain a *prima facie* case of discrimination as to the June 1977 selections. Although some minorities were referred for testing, B & O ultimately selected nine white males for the positions, all whom were more qualified than plaintiff. *See Parker v. B & O Railroad Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981).

1281–82 (D.D.C.1985). Plaintiff has the initial burden of proving a *prima facie* case of discrimination before the burden shifts to the defendant to show a non-discriminatory reason for its action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Plaintiff argues that he has sustained his burden of establishing a *prima facie* case of race and sex discrimination because of his non-selection for one of the December 1976–January 1977 locomotive firemen vacancies. It is uncontroverted that plaintiff applied for the vacancies and was rejected—he was not even referred for testing—and it is also uncontroverted that candidates who were not white males were selected for the vacancies—two blacks and two females in addition to the two white males also selected. Further, for purposes of determining whether plaintiff has established a *prima facie* case, the Court will assume that the existence of B & O's affirmative action program satisfies the requirement that plaintiff show that background circumstances support the suspicion that B & O discriminates against white males.[23] *See Bishopp v. District of Columbia*, 788 F.2d 781 (D.D.Cir.1986); *Lanphear v. Prokop*, 703 F.2d 1311 (D.C.Cir. 1983).

The remaining elements necessary to prove a *prima facie* case, however, are more problematic. Essentially, they break down into two issues: (1) whether plaintiff was qualified for the position, and (2) whether the four minority candidates promoted to locomotive firemen and plaintiff were similarly qualified.

■ The Court concludes on the basis of the trial evidence that plaintiff has failed to establish his side of the issue on these two factors and hence that he has failed to establish a *prima facie* case of discrimination. Plaintiff was not referred for testing because he had not received a positive recommendation from a supervisor, one of the requirements for promotion. As a consequence, therefore, plaintiff did not possess the threshold qualifications for the job: referral by virtue of an expression of interest and a positive recommendation from a supervisor.[24] Further, even assuming that plaintiff was qualified, the evidence produced at trial establishes beyond question that the minority candidates given the positions ahead of plaintiff were not only similarly qualified but were better qualified.

Plaintiff's contention that the minority selectees were less qualified than he (as well as a part of his contention that he was himself qualified) rests primarily on the assertion that "road experience," or experience on the trains themselves as they run the tracks, was a requirement for promotion.[25] Plaintiff had road experience

---

**23.** While B & O has not historically been an employer that discriminates against whites—quite the contrary—the implementation of an affirmative action program at a minimum indicates race and sex consciousness in employment-related decisionmaking. Indeed, B & O openly concedes that minorities and females were hired pursuant to its affirmative action program in a deliberate attempt to increase minority and female representation in its workforce.

**24.** The Court is reluctant to dispose of the case on this ground alone, however, because defendants were unable to produce an explanation as to why plaintiff never received a recommendation from a supervisor. The responsibility for obtaining recommendations lay with the General Road Foreman, not the employee. A recommendation may not have been obtained for plaintiff on account of an administrative over-

sight, not because his supervisor refused to recommend him. *See also*, note 28, *infra*.

**25.** Plaintiff also claims that a good work record, *i.e.*, no disciplinary actions taken against the employee, was a requirement for transfer. The testimony at trial indicated that the existence of a disciplinary record was noted after referral by the General Road Foreman but prior to acceptance by the Employment Office. The disciplinary record was considered at that point on a case-by-case basis, and at any rate, was not an automatic disqualification of any candidate. Furthermore, the evidence shows that white male candidates were transferred notwithstanding disciplinary records as well as minority candidates. Whatever the significance of disciplinary records in evaluating a candidate's suitability for transfer, it is clear that B & O did not manipulate the factor to the advantage of minorities over white males.

while some of the minority candidates promoted did not. Plaintiff's evidence on this point consisted only of testimony from several railroad employees to the effect that they believed road experience was required.[26] A number of B & O managerial personnel testified, however, that road experience was never a requirement; and none of the documentary evidence introduced indicates that road experience was ever required. In fact, prior to 1976, B & O even hired people off the street for locomotive firemen positions although they had no experience whatever with railroads.[27]

Plaintiff argues that road experience is a logical requirement for the position of locomotive engineer, but the law only requires that an employer's choice of minimum qualifications not be a pretext for discrimination.[28] *Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 725 (8th Cir.1984); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). There was no evidence at trial that B & O devised the minimum qualifications for locomotive engineer for the purpose of screening out white male candidates.

While some of the minority applicants had no road experience, they did meet the other requirements: expression of interest, a supervisory recommendation, and successful completion of the appropriate tests. As long as the chosen candidates satisfied the minimum requirements—as these candidates did—it was not discriminatory for B & O to transfer them ahead of plaintiff as part of its affirmative action efforts.[29] *See Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479 (6th Cir.1985).

### IV

In short, then, given that plaintiff did not possess all of the minimum requirements, while those selected for the position did, he has failed to make out a *prima facie* case. But even assuming that plaintiff did make out such a case, his claim of discrimination would still fail because B & O has successfully rebutted that *prima facie* case.

To rebut a *prima facie* case of discrimination, B & O had the burden of showing that it had legitimate, non-discriminatory reasons for not transferring him. In that regard, the railroad claimed that the selection of minorities over him was pursuant to a legitimate affirmative action plan.[30]

An affirmative action plan represents a legitimate basis for a failure to hire or promote a member of the majority race if the program is designed to eliminate conspicuous racial imbalance and it does not "unnecessarily" trammel the interests of white employees. *United Steelworkers v. Weber,* 443 U.S. 193, 208–09, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

■ It is uncontroverted that the position of locomotive fireman on B & O Rail-

---

**26.** When pressed as to why they believed road experience was required, the employees testified that this was simply their general understanding, or that they had been told this by other employees.

**27.** As with disciplinary records, there was some evidence that a candidate's road experience occasionally entered into the selection process as a way to differentiate between two similarly qualified candidates once the minimum qualifications were met.

**28.** The requirement that a candidate have a favorable recommendation from a supervisor is a completely subjective criterion that conceivably could serve as a pretext. There is no evidence, however, that B & O's failure to refer plaintiff for testing on this basis was in fact a pretext. While B & O's explanation for this failure, *i.e.,* administrative oversight, is not very satisfying,

no other evidence produced at trial indicates that this requirement was in fact a pretext. In addition, as discussed *infra,* B & O has come forward with other evidence that establishes in a more general context that B & O had legitimate, non-discriminatory reasons for not promoting plaintiff.

**29.** Of course the affirmative action plan itself must be valid. See *infra.* The Court takes note of the fact that the Supreme Court recently reaffirmed the legality of certain types of affirmative action programs. *Local No. 98, International Association of Firefighters v. City of Cleveland,* —— U.S. ——, ——, 106 S.Ct. 3063, 3072–73, 92 L.Ed.2d 405 (1986).

**30.** B & O also justified its failure to transfer plaintiff by reference to his failure to receive a favorable recommendation. That discussion will not be repeated here in this context.

road has traditionally been dominated by white males.[31] *See Van Aken v. Young,* 541 F.Supp. 448, 457 (E.D.Mich.1982), *aff'd,* 750 F.2d 43 (6th Cir.1984). Several B & O management personnel testified that they were aware of the racial imbalance in their work force and that they developed an affirmative action plan to remedy that imbalance. The plan set hiring goals based on workforce analysis, availability analysis, and past hiring experience. In addition, the SMAs were instituted as part of B & O's affirmative action efforts. Thus, the first *Weber* criterion was clearly satisfied here.

The evidence at trial also established that B & O's plan did not unnecessarily trammel the rights of white employees. White males were not precluded from transfer by the plan—in fact, 82% of the locomotive firemen selected over the years since 1976 have been white.[32] Further, B & O's plan never required white or male employees to be fired in order to replace them with minority employees.[33] The plan focused on filling new job openings with minority candidates, rather than firing existing employees to create employment opportunities for minorities. Finally, as noted, B & O has never successfully met its hiring goals—approximately 10% of the hires for the position since 1976 have been minorities. The modest hiring goals set, together with the low number of minorities actually hired,

can hardly be said to have "trammel[ed] the interest of white employees."[34]

## V

■ Plaintiff also argues that even if the affirmative action plan itself is proper under *Weber,* B & O unlawfully discriminated because it strayed outside the boundaries of the plan in order to hire minorities. Where a plaintiff seeks to prove discrimination in the context of an affirmative action plan, he must show that any infirmities or deviations were the result of the defendants' purposeful maintenance or administration of the plan as a pretext for discrimination. *Hunter v. St. Louis-San Francisco Ry. Co.,* 639 F.2d 424, 426–27 (8th Cir. 1981). In this respect, plaintiff claims that B & O impermissibly waived or manipulated some of the testing requirements for certain transfer candidates.[35] A review of the evidence does not support plaintiff's claim on two bases.

First. B & O provided reasonable non-discriminatory explanations where minimum testing requirements were waived. In a few instances testing was deemed unnecessary because of some special circumstance attending the transferee's application. For example, neither Francis Joura, a white male, nor John King Lee, a black male, were required to pass the tests because they had already been working as locomotive engineers elsewhere.[36] In other

---

**31.** There were no black locomotive firemen at B & O until March 1974, and no women until December 1976.

**32.** The approximately 20 to 30% minority hiring goals (*see supra* ), while not precise, nevertheless are reasonable in light of the fact that B & O operates over a wide geographic area with drastically varying percentages of minorities in the available workforce over that area.

**33.** The hiring goal for blacks at B & O has never been higher than 31%. The Court in *Weber* held that a hiring goal of 50% did not unnecessarily trammel the rights of white employees.

**34.** Likewise, SMAs cannot be said to have had that effect. Although minority candidates transferred pursuant to SMAs were given positions ahead of all other candidates, only a narrow category of employees (those with eligibility

dates prior to August 31, 1971) was eligible for SMA transfer, and the SMAs were in effect for only a limited period of time (the duration of the collective bargaining agreement). Jobs were not created for SMA candidates nor were non-minority candidates fired for SMA candidates. In fact, since December 1976, only two SMA candidates have ever been transferred to locomotive fireman positions in the Baltimore West End district.

**35.** Plaintiff also argues that B & O impermissibly waived the minimum requirements of road experience and a clean disciplinary record, but as discussed elsewhere herein, the evidence did not show that either criterion was ever one of the minimum requirements.

**36.** As another example, the evidence at trial established that B & O did not require the two SMA minority candidates in December 1976 and

instances, the transfer of some applicants with what appear to be unsatisfactory scores is explained by the fact that B & O raised the minimum passing score in June 1977, yet continued to use the pre-June 10 passing rate for candidates who took the test prior to June 10.[37]

Second. The discrepancies alleged by plaintiff benefitted white male applicants more often than minority or female applicants. For example, plaintiff claims that B & O waived test scores for eight transferees between 1977–1979.[38] None of those eight were women, and only three were black.[39] It would appear, then, that plaintiff is asking the Court to strike down an affirmative action plan as impermissibly discriminating against white males on the basis that there are irregularities in the plan which have inured to the benefit of white males more directly than to the benefit of minorities. This proposition must, of course, be rejected.

### VII

Plaintiff also claims that he was retaliated against by B & O officials for complaining about the December 1976–January 1977 selections and his subsequent filing of EEO complaints. It is unlawful for an employer to discriminate against an employee because he has opposed what he reasonably believes to be discriminatory action by the employer. 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 1981; *see McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984); *Goff v. Continental Oil Co.*, 678 F.2d 593, 598 (5th Cir.1982). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that he exercised rights conferred or protected by Title VII; (2) that he received adverse treatment from the employer contemporaneously with or subsequent to such exercise; and (3) that a causal connection exists between the exercise of rights and the adverse action. *Williams v. Boorstin*, 663 F.2d 109, 116 (D.C.Cir.1980).

■ Plaintiff claims that B & O retaliated against him in the years following his complaint over the December 1976–January 1977 selections by refusing to transfer or consider him further for a locomotive fireman position, and by subjecting him to unwarranted disciplinary actions. There is no dispute that plaintiff exercised rights protected under Title VII or that he received adverse treatment in that he was subjected to a series of disciplinary actions and was never transferred to a locomotive fireman position. Plaintiff has not succeeded, however, in establishing any causal connection between the two, and his retaliation claim therefore must fail.

It is plaintiff's theory that various railroad officials, most notably General Road Foreman Kirk, knew that plaintiff was pursuing a discrimination claim because of the December 1976–January 1977 selections and retaliated against him for pursuing that claim. His case regarding a causal connection rests largely on the telephone conversation he had in June 1977 with Kirk. As stated above, plaintiff called

---

**37.** Even if B & O may have been somewhat inconsistent in the manner in which it transferred employees into locomotive fireman positions, plaintiff has not established that the plan as a whole is unfair to white male employees. Under *Weber*, the lawfulness of an affirmative action plan is measured by its overall effect, rather than by its individual features. *See Ende v. Board of Regents of Northern Illinois Univ.*, 565 F.Supp. 501, 510–11 (N.D.Ill.1983).

January 1977 to take the EQC test because both were already B & O employees who were presumed to have EQC test scores on file. In addition, the SMA agreements did not require transferees to take non-skills tests such as the EQC.

**38.** In contrast, the evidence showed that several black males were not transferred because they failed the requisite tests, including Jessie Burden, Gary Nixon, Michael Tyson, Willie McDonald, Darryl Sanders, and Philip Richardson. All were referred for testing between 1977 and 1979.

**39.** The alleged discrepancies for the three black transferees were satisfactorily explained by B & O. One of the transferees did pass the tests, but his scores were not recorded due to a clerical omission; one of the transferees never applied for transfer and indeed was never transferred; and one achieved passing scores under the pre-June 10 scores but was not transferred until well after June 10.

Kirk at home to complain that he had been discriminated against, and he surreptitiously taped the conversation. During the course of the conversation, Kirk expressed disapproval of plaintiff's projected lawsuits and some hostility towards plaintiff. While this is some evidence of retaliatory animus, when viewed with all the circumstances it does not establish a case of retaliation.

First, despite Kirk's expression of disapproval of plaintiff's actions,[40] Kirk also promised plaintiff several times in the same telephone conversation that he would be considered for upcoming transfers and that he would be eventually transferred if he met the minimum qualifications. Moreover, Kirk did indeed refer plaintiff for testing in connection with the April 1978 job order, despite the fact that plaintiff still did not have a positive recommendation. Plaintiff was not transferred to the locomotive fireman position after Kirk's referral because he failed the Davis Reading test; neither Kirk nor any other railroad official had anything to do with that failure.[41]

Plaintiff also claims that Kirk retaliated against him by not referring him for testing for the June 1977 selections, which occurred before he had failed the Davis Reading test. The evidence showed that Kirk divided his list of applicants into two halves because he had a disproportionately high number of applicants for a small number of slots. Plaintiff was placed in the bottom half because Kirk referred candidates who had positive recommendations ahead of him. In any event, plaintiff was referred on the very next job order along with the other eligible candidates not referred in the June order. The Court concludes that Kirk's decision to place plaintiff in the bottom half of a list of candidates to be referred for testing, when he was, in fact, referred on the next job order, does not amount to illegal retaliation.

Moreover, B & O subsequently had another legitimate reason to conclude that plaintiff might not be a suitable candidate for transfer; he behaved in such a way as to provide B & O with a reasonable basis for believing that he was an abrasive and insubordinate employee. The evidence showed that plaintiff went over his superior's head on several occasions, called B & O managerial personnel at home repeatedly to complain about various matters, twice in succession countermanded a superior's order, and insisted on adhering to his own interpretation of the company rules against his supervisors' conflicting interpretations.[43] If plaintiff was indeed not treated with particular favor, it was doubtlessly on the basis of his personality rather than his race or sex.

Plaintiff also claims that Kirk and other railroad officials retaliated against him by taking a series of unjustified disciplinary actions against him. However, the Court is convinced on the basis of the evidence that the disciplinary actions taken were justified and not related to plaintiff's discrimination claim. In most instances, plaintiff was charged with violations of company rules which were sustained by reviewing boards of inquiry. In addition, while the disciplinary actions were sometimes ini-

40. That disapproval was not particularly surprising. It apparently was quite unusual for a relatively low-level employee to call the General Road Foreman at his home with a personal problem.

41. While a number of other job orders came up between April 1978 and November 1980, plaintiff was not again considered for transfer. Although plaintiff claims that this, too, was retaliatory, his failing score on the Davis Reading test was a legitimate, non-discriminatory reason for B & O's action. Plaintiff never inquired about his test results, asked to retake the test, or otherwise took any initiative to follow up on his transfer request.

43. Kirk's taped conversation with plaintiff evidences Kirk's frustration with plaintiff's manner of dealing with the company. Kirk stated:

Now you came in here a few weeks ago, you talked to me. I told you we weren't hiring, and what did you do then. You went to see my boss. Now, what kind of problem was I going to have with you if you became an engineer?

   *    *    *    *    *    *

I can't have guys who fly off the handle and circumvent instructions and try to write [their] own rule book.

tiated by Kirk, plaintiff failed to establish that the B & O officials who investigated each charge, such as Stuart Stigall, a Trainmaster in Baltimore, or the members of the boards of inquiry, were aware that he was pursuing a discrimination claim.[44] Consequently, the Court finds that the defendants were not guilty of retaliatory action.

For the reasons stated, judgment will be entered in all three actions in favor of defendant.

---

**44.** There is also insufficient proof that Kirk's actions in citing plaintiff for various violations of the rules were motivated by retaliatory animus. The actions taken by Kirk were relatively mild; if he were really intent on retaliating against plaintiff he could have been much harsher than he was. For example, plaintiff twice countermanded orders given by Kirk to move a train, yet Kirk took no disciplinary action against him at all.